**BEAVER EXPRESS SERVICE, INC.,
et al., Appellants,**

v.

**RAILROAD COMMISSION OF TEXAS,
et al., Appellees.**

**No. 14620.**

Court of Appeals of Texas,
Austin.

March 25, 1987.

Rehearing Denied April 29, 1987.

Timothy J. Herman, Timothy J. Herman, P.C., Joe K. Longley, Austin, for Beaver Express Service, Inc., Bluebonnet Exp. Inc., Liberty Tex-Pack Exp., Inc., Northern Tex-Pack Exp., Inc., Mistletoe Tex-Pack Exp., Inc., Morgan Exp., Inc., O & A Tex-Pack Exp., Inc., Southwest Tex-Pack Exp., Inc., Western Tex-Pack Exp., Inc., appellants.

Phillip Robinson, Timothy Mashburn, James P. Hart, Robinson, Felts, Starnes, Angenend & Mashburn, P.C., Austin, for Herder Truck Lines, Inc., Brown Exp., Inc., Robert Quentin Farris dba Farris Truck Line, Dixie Truck Lines, Inc., Victor Lange dba Lange Truck Lines, appellants.

Tom H. Davis, Byrd, Davis & Eisenberg, Austin, for Valley Transit Co., Inc., Texas Bus Lines, Sec. Couriers, Inc., Wald Transfer & Storage Co., American Transfer & Storage Co., appellants.

Leroy Hallman, Storey, Armstrong, Steger & Marvin, Rebecca Patton, Dallas, for Trailways, Inc., Trailways Bus System, Inc., American Bus Lines, Inc., Trailways Texas, Inc., Midwest Bus Lines, Inc., Trailways Southern Lines, Inc., Continental Panhandle Lines, Inc., Mistletoe Express Service, appellants.

Ben L. Sarrett, Austin, for Purolator Courier Corp., appellant.

James M. Doherty, Doherty & Munson, P.C., Austin, for Red Arrow Freight Lines, Inc., Merchants Fast Motor Lines, Inc., Alamo Exp., Inc., Greyhound Lines, Inc., Kerrville Bus Co., Inc., Painter Bus Lines, Inc., Texas, New Mexico & Oklahoma Coaches, Inc., Central Texas Trailways, Inc., appellants.

Jim Mattox, Atty. Gen., Douglas Fraser, Asst. Atty. Gen., Austin, for Railroad Com'n of Texas, appellee.

B.D. St. Clair, McGinnis, Lochridge & Kilgore, Irving R. Segal, Schneider, Harrison, Segal & Lewis, Austin, for United Parcel Service, Inc., appellee.

Before POWERS, BRADY and CARROLL, JJ.

POWERS, Justice.

Beaver Express Service, Inc. and other motor carriers sued for judicial review of a final order issued by the Texas Railroad Commission, wherein a certificate of public convenience and necessity was issued to United Parcel Service, Inc. (UPS) under the provisions of Tex.Rev.Civ.Stat.Ann. art. 911b, § 5 (1964). The district court affirmed the Commission order and this ap-

peal ensued.[1] Texas Administrative Procedure and Texas Register Act (APTRA), Tex.Rev.Civ.Stat.Ann. art. 6252–13a, § 20 (Supp.1986); Tex.Rev.Civ.Stat. art. 911b, § 20 (1964). We will affirm the judgment below.

## THE CONTROVERSY

In 1978, UPS applied to the Texas Railroad Commission for authority, evidenced by a certificate of public convenience and necessity, to conduct intrastate operations as a common carrier transporting a limited class of general commodities. Stated generally, the application proposed a statewide, small-package pickup and delivery service between all points in Texas. The Commission dismissed the application, for want of subject-matter jurisdiction, on a theory that the terms of art. 911b, § 10 forbade the Commission to authorize the service on the operational basis proposed by UPS in its application.

From the Commission order dismissing its application, UPS sued for judicial review in a district court of Travis County, as it was privileged to do under art. 911b, § 20. Concluding that the Commission was not legally prohibited from authorizing the kind of motor-carrier service proposed by UPS, the district court reversed the Commission order and remanded the case to the agency for a hearing on the merits of the UPS application. On appeal to this Court by the Commission and others, we affirmed the judgment of the district court. *Railroad Commission of Texas v. United Parcel Service,* 614 S.W.2d 903 (Tex.Civ.App. 1981), writ ref'd n.r.e., 629 S.W.2d 33 (Tex. 1981). We held in that appeal, after a complete examination and analysis of the

relevant statutory provisions and case law, that no rule of law precluded the Commission's authorizing a common carrier to operate in the manner proposed by UPS in its application. *Railroad Commission,* 614 S.W.2d at 915. The Supreme Court of Texas, in a *per curiam* opinion, refused application for writ of error, no reversible error. The court stated:

> The court of civil appeals has correctly held that the Commission has power and authority to hear and consider applications for common motor carrier certificates which request that such common carriers be allowed to operate over irregular routes and on irregular schedules. However, we are not to be understood as approving the language of the court of civil appeals to the effect that a common motor carrier may operate over irregular routes and on irregular schedules. That question is reserved for future determination when it is presented for our review.

*Railroad Commission,* 629 S.W.2d at 33, 34. One of the major disputes between the parties in the present appeal revolves around this statement by the Supreme Court.

Following the Supreme Court's *per curiam* opinion, the controversy returned to the Commission where extensive hearings were held on the merits of the UPS application. In a final order dated January 21, 1985, the Commission granted the UPS application on the agency's determination that (1) it possessed the statutory power to authorize the manner of operation proposed in the UPS application and (2) the facts and law applicable to the case re-

1. Appellants are: Beaver Express Service, Inc., Bluebonnet Express, Inc., Liberty Tex-Pack Express, Inc., Northern Tex-Pack Express, Inc., Mistletoe Tex-Pack Express, Inc., Morgan Express, Inc., O & A Tex-Pack Express, Inc., Southeast Tex-Pack Express, Inc., Western Tex-Pack Express, Inc., Central Freight Lines, Inc., Herder Truck Lines, Inc., Curry Motor Freight Lines, Inc., Brown Express, Inc., Robert Quentin Farris, d/b/a Farris Truck Line, Dixie Truck Lines, Inc., Victor Lange, d/b/a Lange Truck Line, Valley Transit Co., Inc., Texas Bus Lines, Security Couriers, Inc., Wald Transfer & Storage Co., American Transfer and Storage Company, Trail-

ways, Inc., Trailways Bus System, Inc., American Buslines, Inc., Trailways Texas, Inc., Midwest Buslines, Inc., Trailways Southern Lines, Inc., Continental Panhandle Lines, Inc., Mistletoe Express Service, Purolator Courier Corporation, Red Arrow Freight Lines, Inc., Merchants Fast Motor Lines, Inc., Alamo Express, Inc., Greyhound Lines, Inc., Kerrville Bus Company, Inc., Painter Bus Lines, Inc., Texas, New Mexico & Oklahoma Coaches, Inc., Central Texas Trailways, Inc.

Appellees are: Railroad Commission of Texas, United Parcel Service, Inc.

quired issuing the certificate requested by UPS. In the order, the Commission adopted the findings of fact and conclusions of law reached by its hearing examiner.[2] Beaver Express Service, Inc. and other motor carriers ("appellants") sued for judicial review in a district court of Travis County; and, from that court's final judgment affirming the Commission order they bring the present appeal.

## THE COMMISSION'S STATUTORY POWER AND AUTHORITY

Appellants bring several points of error wherein they basically renew their contention that the Commission lacked statutory authority to entertain and grant a common-carrier certificate authorizing the manner of operation proposed by UPS in its application. This question was considered at length in our opinion in the earlier appeal. *Railroad Commission*, 614 S.W.2d at 912–15. Appellants argue with renewed vigor, however, on the strength of the following sentence in the Supreme Court's *per curiam* opinion:

> [W]e are not to be understood as approving the language of the court of civil appeals to the effect that a common motor carrier may operate over irregular routes and on irregular schedules.

*Railroad Commission*, 629 S.W.2d at 33, 34. Appellants infer from this sentence that the legal effect of the *per curiam* opinion was to make a distinction between what the Commission may *hear* and what it may lawfully *do* after such hearing. The effect of the per curiam opinion, properly interpreted in appellants' view, is to distinguish between the Commission's power to *entertain an application* proposing operations "over irregular routes and on irregular schedules" and its power to *authorize* such operations in a certificate of public convenience and necessity. Since the *latter* issue was expressly and specifically reserved in the per curiam opinion, appellants argue, the Supreme Court has cast doubt upon our earlier holdings and we should, at minimum, re-examine the ques-

tion whether the Commission had jurisdiction to authorize the method of operation proposed by UPS in its application. We disagree.

■ In the first place, we do not believe one may fairly say our opinion in the earlier appeal contained "language ... to the effect that a common carrier may operate over irregular routes and on irregular schedules." This is neither the tenor of our opinion nor the effect of our holdings. The earlier appeal dealt exclusively with the correctness of the Commission's action in dismissing the UPS application on a theory that the agency possessed no "jurisdiction" to authorize the manner of common-carrier operations proposed by UPS *in its application*. This theory derived from the terms of art. 911b, § 10, which provides that the Commission is forbidden to "consider" a common-carrier application that does not show the "complete route or routes over which the applicant desires to operate" and the applicant's proposed "schedule of service." The opposing carriers *imputed* to these statutory expressions this meaning: the Commission is forbidden to "consider" an application that proposes common-carrier operations "over irregular routes and on irregular schedules." They made yet another imputation however. They imputed to the UPS *application* a request for the forbidden authority to operate "over irregular routes and on irregular schedules."

While the UPS application actually proposed a form of combined operations that were in large part on fixed routes and uniform time tables with another part to which the second imputation could logically apply, we accepted the assumption that the entire manner of proposed operation was infected by the vice attributed to it by the opposing carriers, taking care to set out precisely what manner of operation UPS *actually* proposed. *Railroad Commission*, 614 S.W.2d at 905–06. The dispute therefore reduced to whether art. 911b, § 10 or any other section, properly construed, denies the Commission power ("jur-

---

**2.** One commissioner dissented, stating he was convinced the Legislature has not granted authority for common carriers to operate over irregular routes with no schedules.

isdiction") to authorize the manner of operation *actually* proposed in the UPS application. We phrased the parties' respective contentions as follows:

> In the provisions of [art. 911b] appellee finds a delegation of express or implied authority allowing the Commission to consider and determine appellee's application, as in the ordinary case of a common carrier seeking a certificate of convenience and necessity. On the other hand, appellants argue vigorously that these same statutory provisions confer no such express or implied authority upon the Commission, with respect at least to the manner of operation proposed in appellee's application.

*Id.* at 907. Thus, the appeal dealt exclusively with a problem of statutory construction under the opposing carriers' twin imputations that the UPS application proposed and art. 911b forbade the Commission to authorize common-carrier operations "over irregular routes and on irregular schedules." We placed that expression in quotation marks, in our earlier opinion, to signify that it was the language of others and not our own. We *held* ultimately that nothing in art. 911b forbade the Commission to authorize the manner of operation *actually* proposed by UPS in its application and that the Commission erred in dismissing the application on the theory that it possessed no "jurisdiction" to grant it.

*Whether* the Commission *may* wish to authorize such operations was and is, in our view, a matter committed by the relevant parts of art. 911b to the Commission's discretion—to its special knowledge, policies, and judgment about the relevant factors and what is required in the public interest. The Legislature has given the Commission great power and flexibility in that regard (in terms that are about as broad as they can be) to effectuate the legislative purposes that lie behind art. 911b. As an example of these powers, we pointed in our earlier opinion to art. 911b, § 4(a), emphasizing the Commission's power "to prescribe the schedules and services of motor carriers...." *Railroad Commission,* 614 S.W.2d at 908.

We did *not* hold or say in our earlier opinion "that a common carrier may operate over irregular routes and on irregular schedules." The power of initial decision in that regard does not lie with us or any other court. It lies rather in the Commission. We *did* say and hold that the Commission misconstrued the relevant statutory provisions when the agency concluded that art. 911b, § 10 denied it the power to decide the UPS application based upon the manner of operation proposed therein. *Id.* at 915. We remain convinced of the correctness of our reasoning and holdings in that regard. We therefore overrule appellants' contentions to the extent they contend anew for an opposite interpretation of art. 911b.

There remains, however, the question of whether the Supreme Court's *per curiam* opinion implies a disagreement with our previous construction of art. 911b. We turn then to appellants' contentions regarding the proper meaning to be assigned that opinion.

■ In the *per curiam* opinion, appellants believe the Supreme Court impliedly disagreed with our earlier holding that the Commission possessed "jurisdiction" to determine whether to authorize the manner of operation proposed in the UPS application. Broadly stated, the "jurisdiction" of an administrative agency means (in the present context) the power to hear and determine a matter committed to the agency's discretion by statute. *See generally, Jud v. City of San Antonio,* 143 Tex. 303, 184 S.W.2d 821, 822 (1945); *National Life Co. v. Rice,* 140 Tex. 315, 167 S.W.2d 1021, 1024 (1943). Except where constitutional provisions enter into the matter, statutes create and define the jurisdiction of administrative agencies and, on occasion, they prescribe to a greater or lesser extent the manner in which the delegated jurisdiction shall be exercised. *Crosthwait v. State,* 135 Tex. 119, 138 S.W.2d 1060 (Tex.1940). These statutes are to be construed under the presumption that the Legislature never intends that the functions committed to the agency should be exercises in futility.

*State v. Jackson,* 376 S.W.2d 341 (Tex. 1964); *Key Western Life Ins. Co. v. State Board of Insurance,* 163 Tex. 11, 350 S.W.2d 839 (1961); *Stauffer's v. City of San Antonio,* 162 Tex. 13, 344 S.W.2d 158 (1961); *Railroad Commission v. Rowan,* 152 Tex. 439, 259 S.W.2d 173 (1953); *Humble Oil & Refining Co. v. Railroad,* 133 Tex. 330, 128 S.W.2d 9 (1939); *Railroad Commission v. Red Arrow Freight Lines,* 96 S.W.2d 735 (Tex.Civ.App.1936, writ ref'd).

■ The controversy in the present case is about the Commission's power to hear and determine applications for certificates of public convenience and necessity under art. 911b, §§ 3, 5, 8, 10, and 14. It is a power to "license" the applicant's transportation of goods—an economic activity that is forbidden by § 3 of that statute except that it be done under the Commission's authority, evidenced by such a certificate. Shall we then interpret the Supreme Court's *per curiam* opinion to mean that the Commission may perhaps "hear and consider" the UPS application but that it may not authorize the manner of operation proposed *therein?* Stated another way, does that opinion imply that the Commission may perhaps entertain the UPS application and embark upon the hearings required in that regard, but in the end it must invariably deny the application or dismiss it for want of jurisdiction because the Commission is controlled by a rule of law (presumably found in art. 911b) that prohibits the Commission to authorize the manner of operation proposed in the application? We cannot believe such a futile exercise of agency powers was intended by the Supreme Court. Perhaps the Supreme Court intended to distinguish between that part of the UPS application that might fairly be characterized as proposing "irregular routes and ... schedules" and the other part that did not, the court reserving only the former for its future consideration and determination. But it is idle to pursue such possible implications in the Supreme Court's opinion when we are satisfied that the Commission did not lack the statutory power to authorize the manner of operation proposed *in the UPS application,* however

it be characterized by opposing parties. That is what the Commission authorized after remand to the agency. The Legislature did not forbid such action and it fell within the broad general powers of the Commission; particularly it fell within the agency's power "to prescribe the schedules and services of motor carriers...." Art. 911b, § 4(a). The Supreme Court has never held to the contrary. We may therefore turn to other matters.

## THE COMMISSION'S ULTIMATE FINDINGS OF PUBLIC CONVENIENCE AND NECESSITY

Motor carriers are forbidden to operate in Texas as common carriers except under official authority of the State evidenced by a certificate of public convenience and necessity issued by the Commission. Tex. Rev.Civ.Stat. art. 911b, §§ 3, 5. Upon the filing of an application for such a certificate, it becomes the duty of the Commission to determine "if there exists a public necessity for" the service proposed by the applicant and "if public convenience will be promoted by granting said application and permitting the" proposed service, both to be determined "after considering existing transportation facilities, and the demand for, or need of additional service...." Art. 911b, § 8. Concerning the service proposed by UPS in its application, the Commission determined: (1) "[t]he public convenience would be promoted by, and public necessity exists for, the service proposed by [UPS]"; and (2) "[e]xisting carriers are not adequate for the transportation of small packages between all points in Texas." Appellants contend these findings of ultimate fact are erroneous because they rest upon various procedural errors that require a reversal of the Commission's final order and a remand of the controversy to the agency. We shall discuss in the remainder of our opinion these contentions of particular procedural errors.

## BURDEN OF "PROOF" IN THE AGENCY PROCEEDING

Appellants contend the Commission's determinations were reached upon unlawful

procedure because UPS was relieved of a burden of proof placed upon it by statute— and, conversely, that the burden was improperly placed upon appellants. They argue that before September 1, 1983, the burden of proof in the certification process lay upon the applicant to show that a public necessity existed for the proposed service and that the public convenience would be promoted by granting the application and authorizing the proposed service. This burden included a showing sufficient to allow the Commission to consider "existing transportation facilities, and the demand for, or need of additional service...." art. 911b, § 8. However, on September 1, 1983, art. 911b was amended by the addition of § 4(e), which provides as follows:

> ... With respect to showing public convenience and necessity, the applicant is required to prove a *prima facie* case that the public convenience would be promoted and a *prima facie* case that a public necessity exists, and in these circumstances, the burden of proof to show that the public convenience would not be promoted or that a public necessity does not exist for the proposed service or that the existing carriers are rendering a reasonably adequate service *shifts* from the applicant to the opposing carrier or carriers.

(emphasis added).

The effective date of the amendment fell in the midst of the Commission proceeding

we now review: hearings began September 21, 1982; UPS completed its case-in-chief in April 1983; appellants presented their case beginning in August 1983; and, the last hearing before the hearing examiner was held in December 1983. The hearing examiner purportedly gave effect to the amendment and concluded that UPS had made a prima facie showing, as required by § 4(e), and that appellants had failed to "rebut" that showing.

■ Appellants argue that the new § 4(e) shifted to them the burden of proof to establish "that the existing carriers are rendering a reasonably adequate service...."[3] This is, they say, a change from the preceding law under which UPS would have had to establish the *in* adequacy of existing service. In any case, however, the Commission concluded in its final order that UPS "proved that the existing carriers were inadequate," thereby satisfying what was required of it, as an applicant, under art. 911b as it existed *before* September 1, 1983.

■ We will assume, without deciding, that § 4(e) indeed made the change attributed to it by appellants. We assume then that § 4(e) placed upon appellants a burden both of offering evidence and persuading the trier of fact relative to the proposition that existing services were reasonably adequate.[4] This premise implies the corollary

---

3. In a related provision, we note that art. 911b, § 5a(d) contains an anomaly in its statement that a prima facie showing by an applicant will justify issuance of a certificate "unless it is established by the *substantial evidence* of record considered as a whole that" existing services and facilities are inadequate; that a public necessity does not exist for the proposed service; or, that public convenience will not be promoted by the proposed service. (emphasis added). The substantial-evidence rule has no place in the process whereby administrative agencies determine the truth in conflicting factual contentions. Rather, it is *solely* a judicial-review concept, designed to assure that reviewing courts observe their proper sphere of authority.

Within the contested-case proceedings conducted by an administrative agency, one "must normally prove a fact by a preponderance of the evidence, but occasionally the burden is a heavier one." 3 Davis, Administrative Law Treatise, 255–256 (1980). Professor Davis adds: "One

can *never* prove a fact by something less than a preponderance of the evidence." (emphasis in original). *Id. See also,* Schwartz, Administrative Law, 360–62 (1984). For a good discussion of this point, and others related to the substantial-evidence rule and agency fact findings, *see* Clark and Lynch, Findings of Fact and Conclusions of Law in Agency Adjudications of Contested Cases, *Texas Administrative Practice and Procedure* at E–1—E–35 (State Bar of Texas, 1985).

4. We find no judicial decision that construes the new § 4(e). Its proper construction must await future decision. We will here point out, however, that the effect of § 4(e) is not altogether clear. There has been a correlative amendment of § 10(4). Whereas it previously required an applicant to "point out" in his application "the inadequacy of existing transportation facilities or service," this requirement was deleted in 1983 Tex.Gen.Laws, ch. 263, at 1186, effective September 1, 1983. This is, of course, consist-

that § 4(e) did *not* require that UPS make a prima facie case of inadequate service. Even so, the Commission's order adopts an elaborate set of findings of basic fact that reasonably support several findings of ultimate fact, also *adopted by the Commission*, all to the effect that existing carriers *were* supplying an *inadequate* service. These are *affirmative* findings of *inadequate* service. Thus it appears beyond dispute that the Commission *applied* the previous law for which appellants contend and they could not have been harmed in the particular claimed, especially when they have not shown (as discussed below) that these affirmative findings of inadequate service are not reasonably supported by the attendant findings of basic fact, or that the findings of basic fact are not supported by substantial evidence. We may reverse the Commission's final order only on a showing by appellants that their substantial rights were affected adversely in the particular claimed here. APTRA § 19(e). This does not appear to be the case. In consequence, we overrule the point of error discussed herein.

## THE PROPOSAL FOR DECISION

■ Appellants contend the Commission erred in directing its examiner to prepare a second proposal for decision after the first was rejected by the Commission. The con-tention is premised upon a contention that the Commission thereby violated its own regulations.

The tenor of the examiner's first proposal for decision was to resurrect the judicially rejected doctrine that the Commission possessed no authority to issue a common-carrier certificate of public convenience and necessity that would permit operations in the manner proposed by UPS in its application. After hearing argument, the Commission concluded to the contrary and directed the examiner to prepare the second proposal for decision in accordance with the Commission's determination on that question of law.

Article 911b, § 14(b) vests an examiner with authority "under orders of the Commission to hear applications which may be assigned to him by the Commission...." We find no judicial decision, regulation, or statute that prohibits the course followed by the Commission in the present case, nor are any suggested to us by appellants. Appellants' contention is contrary to those statutes vesting decision-making power in the commissioners. *See Morgan Drive-Away, Inc. v. Railroad Commission of Texas*, 498 S.W.2d 147, 149–50 (Tex.1973); *City of Frisco v. Texas Water Rights Commission*, 579 S.W.2d 66, 72 (Tex.Civ.App. 1979, writ ref'd n.r.e.). We overrule appellants' contention.

ent with the view that a burden was placed upon those opposing the application to show the adequacy of existing services.

On the other hand, art. 911b, § 8 has not been amended and it continues to provide that the Commission labors under a duty

to ascertain and determine under such rules and regulations as it may promulgate, *after considering existing transportation facilities,* and the demand for, or need of additional service, if there exists a public necessity for such [proposed] service, and if public convenience will be promoted by granting said application and permitting the [proposed operations].

(emphasis and parenthetical statements added). Similarly, § 9 has not been amended, and it continues to provide that the Commission may deny an application if it determines "that the service rendered through existing transportation facilities or agencies is reasonably adequate," among other possible determinations that would justify the denial. Finally, § 4(d) continues to provide that the Commission must "regu-late motor carriers *in all matters* ... so as to carefully preserve, foster and regulate transportation...." (emphasis supplied). This provision speaks to one of the primary purposes of art. 911b—to prevent "ruinous" competition. *See* Bailey, *Motor Truck Certificates and Permits in Texas*, 20 Tex.L.Rev. 165, 167–72 (1941). The other fundamental purposes behind art. 911b are to provide transportation services to all segments of business and industry where such services are necessary and to develop a complete transportation system for the State. *Oil Field Haulers Ass'n v. Railroad Commission of Texas*, 381 S.W.2d 183, 194 (Tex.1964). These purposes are, of course, represented by the triad of public necessity, public convenience, and the state of existing facilities and services, implicit throughout art. 911b as it relates to common carriers. That being so, it remains open to question whether the Commission may issue a common-carrier certificate even if there is no showing or finding of inadequate services or facilities, as might happen, for example, when an application is not opposed.

## FINDINGS OF BASIC FACT

■ Appellants contend the Commission erred in failing to make specific findings of fact and in failing to consider and rule on certain findings of fact requested by appellants.

Article 911b, § 5a(d) provides that a Commission order, granting or denying an application of the kind in question here, is void unless it sets forth "full and complete findings of fact on the issues of adequacy of the services and facilities of the existing carriers, and the public need for the proposed service" The findings of fact referred to in this statute are the basic or underlying facts also required by APTRA § 16(b).[5] *See Purolator Armored, Inc. v. Railroad Commission of Texas,* 662 S.W.2d 709 (Tex.App.1983, no writ). Arti-

cle 911b, § 5a(d) thus requires that the Commission make findings of basic fact sufficient to demonstrate reasonable support for its conclusions of law or findings of ultimate fact, including for example those relating to the adequacy of existing transportation facilities, the demand or need for additional facilities and services, and the other factors mandated by art. 911b in proceedings relative to common-carrier certificates of public convenience and necessity. *See e.g.* art. 911b, § 9.

We find the Commission's final order demonstrates complete compliance with § 5a(d) and that it expressly and properly rejected the findings of underlying fact suggested by appellants.[6] We therefore overrule appellants' point of error.

---

5. APTRA § 16(b) provides:

   Findings of fact, if set forth in statutory language, must be accompanied by a concise and explicit statement of the underlying facts supporting the findings.

   *See generally,* Powers, *Judicial Review of the Findings of Fact Made by Texas Administrative Agencies in Contested Cases,* 16 Texas Tech.L. Rev. 475, 483–486 (1985).

6. The Commission's findings are those recommended by the hearing examiner and adopted by the Commission. 16 Tex.Admin.Code § 5.447.

   From the testimony of several hundred witnesses, the Commission found the public required services having certain characteristics proposed by UPS in its application:

   ■ Door-to-door service and full statewide territorial coverage with no restrictions on pickup and delivery....

   ■ Prompt, dependable delivery with no more than second day delivery between points in Texas....

   ■ Three delivery attempts made automatically and automatic return of refused or undeliverable packages without additional charge ...

   ■ Automatic daily pickup at a small weekly service charge ...

   ■ Automatic insurance coverage of $100 per package against loss and damage with unlimited additional coverage available ...

   ■ High standards of appearance of drivers and vehicles ...

   ■ Simplified C.O.D. procedure ...

   ■ Service designed for careful handling of small packages ...

   ■ Written proof-of-delivery ...
   Prompt tracing response ...
   Simplified documentation ...
   Correction of wrong address ...

   ■ Prompt claims handling ...
   Package return service ...
   ■ UPS [would] not use independent agents or interline with other carriers....

   The findings of fact are divided into categories. The first category relates to the findings of ultimate fact pertaining to public convenience and necessity. In that category, the Commission found that 180 shippers of small packages and 120 consignees of such small packages supported the UPS application.

   The Commission made further findings concerning shippers who currently ship immediately across Texas state lines to take advantage of UPS's interstate service. Finally the Commission found that the United States Postal Service is the primary transporter for 148 of the 180 shippers. In a discussion following these findings, the Commission stated UPS's proposed service would divert business primarily from the Postal Service. This diversion would bring under regulation traffic not previously regulated in Texas; consequently, granting the UPS application would have no substantial adverse economic effect on existing carriers.

   The Commission next discussed the inadequacy of existing carriers and made findings of fact concerning that inadequacy. The findings detail by class of carrier existing deficiencies in comparison to the service proposed by UPS, and further set out certain inadequacies complained of by specific receivers concerning specific carriers. In a final section, the Commission discussed and made findings concerning the fitness of UPS, setting out in detail the proposed service, present UPS operations in Texas, financial soundness, types of vehicles used, locations of facilities, and experience.

   This Court addressed the sufficiency of findings of fact under art. 911b § 5a(d) in *Purolator Armored, Inc., supra.* In that opinion we stated the purposes of requiring underlying facts are

## ERRORS IN ADMITTING EVIDENCE

Appellants' final points of error allege that the Commission's conclusions of law are not supported by findings of underlying fact because certain findings made by the examiner were based on improperly considered evidence. Therefore, the Commission acted arbitrarily and capriciously in appellants' view.

■ The principal evidence which appellants argue was improperly considered is that concerning: (1) the service provided by the United States Postal Service; (2) UPS proposed rates which are lower than existing rates; (3) automatic insurance coverage; (4) a $3 weekly charge for daily pickup; (5) simplified documentation; and (6) a simplified C.O.D. procedure.[7]

■ We consider first the evidence concerning the United States Postal Service. This evidence bore alike upon the matter of the public need for and the expected effect the proposed service would have on existing carriers.[8] Through this evidence, UPS demonstrated that many shippers use the Postal Service for transporting small packages and parcels of a kind UPS would carry if granted authority to do so. One hundred and forty-eight of 180 shipper witnesses testified that the Postal Service was their primary mode of shipping; thirteen used the Postal Service exclusively. These shipper witnesses also used UPS to send from 4 to 45,000 packages per week outside of Texas or between certain points in Texas already served by UPS. The examiner concluded from this evidence that a public need existed for an intrastate service as proposed by UPS. She further concluded

that since the bulk of the traffic diverted to UPS would be from the Postal Service, granting the authority requested by UPS would have no disproportionate or adverse economic impact on other existing carriers. In APTRA § 14(a) and 16 Tex.Admin.Code § 5.434, it is provided that evidence is admissible in an administrative hearing as in nonjury civil cases in Texas district courts. Appellants have cited no authority nor does our research reveal any, which would warrant excluding this probative evidence.

■ Concerning the evidence relating to UPS rates, appellants contend it was improperly admitted because the proposed rates for UPS have not been approved by the Commission and no evidence was adduced to show that existing carrier's rates were unreasonably high. This was not error in our view. The Commission may consider evidence of *prospective* rates where it finds the rates charged by existing carriers inhibit use of their services by the public. *Purolator Armored, Inc. v. Railroad Commission of Texas, supra,* at 719. The examiner made specific findings, and the Commission adopted them, that existing carriers' rates were prohibitive.

■ Appellants' remaining challenges to the evidence are overruled.[9] We are authorized to reverse the judgment of the district court and remand to the agency only if *substantial* rights of the appellants have been prejudiced. APTRA § 19(c). Even if the challenged evidence was improperly admitted, any error was not prejudicial in this sense.

(1) to maximize the likelihood that the Commission's decision will be based on legal rules and that these legal rules will be consistently and clearly applied, (2) to apprise the parties of the grounds upon which the Commission's decision rests, and (3) to enable the reviewing court to properly apply standards of review. *Id.* at 714. In our view, the findings of fact in this case are sufficient to meet the requirements of art. 911b § 5a(d) and APTRA § 16.

7. Appellants allege that all elements of finding of fact number 6 are either prohibited by law or already provided by other carriers. Appellants only briefed arguments concerning *parts* of finding of fact number 6. Any error concerning

parts of finding of fact number 6 not specifically discussed is therefore waived pursuant to Tex.R.App.P. 74 (West 1986).

8. The United States Postal Service intervened in the proceedings before the agency but took no position on the merits.

9. Appellants challenge evidence of the C.O.D. procedures proposed by UPS, namely accepting checks for C.O.D. shipments, and its simplified documentation procedures. Subsequent to its issuing the final order in this proceeding, the Commission promulgated regulations which appear to authorize such procedures. 16 Tex.Admin.Code §§ 5.102 and 5.114.

In accordance with our opinion, we affirm the judgment of the district court.

BRADY, Justice, dissenting.

I respectfully dissent.

First, I pay high respect to the majority opinion for its attempt to formulate a logical construction for this complex and confused statute. As stated, art. 911b is a patchwork statute riddled with specific specialized exceptions but intended to be a broad regulation of all the state's commercial motor carriers.[1] Although it is the duty of the courts to attempt to construe legislation in a manner to avoid seemingly illogical results, the literal language of this statute and its accompanying statements of legislative purpose suggest that the Legislature intended a much more restrictive regulatory scheme than is reflected in the majority's opinion. Because the statutory language strictly confines common motor carriers to regular routes and schedules, the Commission's action in permitting U.P.S. to deliver this sort of freight over irregular routes and schedules in effect creates a new class of carriers. Given the restrictive nature of the statute and the long history of strict judicial interpretation, I cannot agree that this legislation delegated such broad authority to the Commission.

While the Commission may have had jurisdiction to consider the application, it does not necessarily follow that they had the power to grant all portions of it. In my view, the *per curiam* opinion of the Supreme Court in *Railroad Commission v. United Parcel Service*, 629 S.W.2d 33 (Tex. 1981), approved this Court's holding that the Commission had authority to consider the application because that application contained a proposal for conventional regular routes and schedules which it combined with an additional proposal for irregular routes and schedules. I think the Supreme Court merely recognized that the history of judicial interpretation of art. 911b has been one of strict construction. Whatever authority is not unequivocally granted to the Commission in clear and explicit terms must be considered withheld. *Dye Trucking Co. v. Miller*, 397 S.W.2d 507 (Tex.Civ. App.1965, writ ref'd n.r.e.).

Article 911b of the Texas Motor Carrier Act creates two separate classes of motor carriers. The article was enacted fifty-eight years ago and has been amended at almost every session of the Legislature since then. In 1941, substantial amendments created a class of motor carriers called "special commodity carriers" while leaving those provisions concerning "regular route carriers" undisturbed and unrepealed. As pointed out by Justice Pope in *Alamo Express, Inc. v. Railroad Commission*, 407 S.W.2d 479 (Tex.1966), the procedures for application and regulation of these two classes of motor carriers have different legislative origins and are contained in separate sections of the Act. These classes are also distinguished by the fact that only specialized commodity carriers are expressly permitted operations over irregular routes or schedules.

The earlier opinion by this Court in *Railroad Commission v. U.P.S.*, 614 S.W.2d 903 (Tex.App.1981) which resulted in the above mentioned *per curiam* decision by the Supreme Court, distinguished Judge Pope's opinion in *Alamo Express, supra*, stating that if that Court had intended to say that common carriers were barred by law from operating on irregular routes and on irregular schedules, that the Court would have expressly said so and not left the matter to be inferred. *Id.* at 913. However, that question was not presented for review in *Alamo Express*, and in this writer's view, Justice Pope's statement that "procedures respecting the two classes of carriers are and always have been different in many ways," *Alamo Express* at 482, is sufficiently instructive that we can infer a clear differentiation of legislative purpose concerning the two classes of carriers. This difference in purpose for each class compels us to precisely construe each dif-

---

1. See *Railroad Commission v. United Parcel Service*, 614 S.W.2d 903, 907 (Tex.App.1981, writ ref'd n.r.e.).

ference in the statutory language creating those classes.

In *Railroad Commission v. Central Freight Lines,* 434 S.W.2d 911 (Tex.Civ. App.1968, writ ref'd n.r.e.), this Court recognized the difference in purpose between the two classes and strictly construed the statute thereby holding the Commission could not authorize a non-specialized motor carrier to operate over irregular routes. In relation to the requirement of regular routes, this Court said:

> This language, in our judgment, must be read in context with all the other statutes on the subject. It does not give the Commission unbridled discretion to issue a certificate on any terms or conditions it pleases and without regard to the application for the certificate and the statutes and decisions respecting the contents of the application by which the privileges which may be awarded applicant must be measured.

*Id.* at 918. The majority opinion in this case appears to retreat from this strict interpretation of the statute and allows the Commission to authorize a common motor carrier to engage in a method of delivery only expressly permitted to specialized motor carriers.

An examination of the statutory language in art. 911b, § 1(g) and (i) defining "motor carrier" and "specialized motor carrier" reveals that only specialized motor carriers are defined as operating over "irregular routes on irregular schedules." Furthermore, § 10 of art. 911b requires that no application be considered by the Commission unless it sets forth "(2) the complete route or routes ... and (3) a proposed schedule of service ... in addition to a plat or map showing the route or routes over which the applicant desires to operate." The only language in 911b which would allow the Commission to consider an application without regular route designations is the language establishing the class of specialized motor carriers. Because the nature of the statute requires the differences between the two classes to be strictly construed, it must be assumed by the courts that each class may only be

allowed to operate with the characteristics expressly bestowed by the statutory language defining it.

The Legislature intended the Motor Carrier Act to be an exclusive statute only permitting such commercial carrier traffic as expressly authorized by its provisions. This intent is revealed in its accompanying statements of policy. In Tex.Rev.Civ.Stat. Ann. art. 911b, § 22a (1964), the Legislature stated:

> The business of operating as a motor carrier of property for hire along the highways of this state *is declared to be a business affected with the public interest. The rapid increase of motor carrier traffic,* and the fact that under existing law many motor trucks are not effectively regulated, *have increased the dangers and hazards on public highways* and make it imperative that more stringent regulation should be employed, to the end that the *highways may be rendered safer for the use of the general public;* that the wear of such highways may be reduced ...

(Emphasis added). It was also stated under art. 911b § 4 that:

> The Commission is further authorized and empowered *and it shall be its duty,* to supervise and regulate motor carriers in all matters whether specifically mentioned herein or not so as to carefully preserve, foster and regulate transportation and *to relieve the existing and all future undue burdens on the highways arising by reason of the use of the highways by motor carriers,* adjusting and administering its regulations in the interests of the public.

(Emphasis added). These statements of the legislative purpose motivating this regulatory scheme evidence a clear intent to limit commercial carrier traffic on our state's highways. Considering the exclusive legislative purpose behind the Motor Carrier Act, the rigid statutory language creating both carrier classifications, and the long tradition of strict judicial interpretation of this regulatory framework, I can conceive of no consistent construction of

art. 911b which would support the Commission's approval of this sort of service.

I must respectfully dissent.